The PEOPLE of the State of Colorado, Plaintiff-Appellee,

v.

Jerry M. DEITCHMAN, Defendant-Appellant.

No. 84SA16.

Supreme Court of Colorado, En Banc.

Feb. 11, 1985.

Rehearing Denied Feb. 25, 1985.

Duane Woodard, Atty. Gen., O. Otto Moore, Asst. Dist. Atty., Brooke Wunnicke, Chief Appellate Deputy Dist. Atty., Denver, for plaintiff-appellee.

David F. Vela, Colo. State Public Defender, Steven Katzman, Special Deputy Public Defender, Littleton, for defendant-appellant.

## PER CURIAM

The defendant, Jerry Deitchman, appeals his convictions of first-degree sexual assault, second-degree kidnapping, and attempted second-degree kidnapping. §§ 18–3–402; 18–3–302; and 18–2–101, 8 C.R.S. (1978). As the sole ground for reversal, defendant claims that the district court improperly admitted evidence seized from his residence and automobile pursuant to defective warrants.

During a ten-day period in 1981, the Denver Police Department received reports from four teenage girls of separate assaults and sexual attacks that occurred in the Lincoln High School area. Each victim described her attacker as a male who was approximately twenty years old and who was between five foot seven and five foot nine inches in height. In addition, all four victims stated that their assailant drove a small, light-colored automobile. Two of the victims stated that the assailant threatened them with a broken bottle, shoved them into his car, and forced them to perform fellatio. One of the victims told the police that her assailant wore a pair of size eight, white, Nike tennis shoes with a neutral stripe and black shoe laces. She reported that the name "Janet" was written on the inside of the left shoe. Another victim stated that she had seen a red bandana hanging from the rear view mirror of her attacker's car. Two of the victims identified the license plate on the assailant's automobile as CN–4714.

Records from the Colorado Motor Vehicle Department disclosed that license plate number CN–4714 was issued for a 1971 Toyota registered to Jerry Deitchman. The police obtained a photograph of Deitchman from the Denver Police Department's Identification Bureau and prepared a photographic display that included Deitchman's photograph. After viewing the photograph array, three of four victims identified Deitchman as their assailant. The police were unable to locate Deitchman until they contacted his employer and learned that he had moved to 3300 West Ohio Avenue in Denver.

On November 10, 1981, two Denver police detectives, acting pursuant to a Crim.P. 41.1 court order, went to the defendant's residence for the purpose of obtaining his presence in a physical lineup. When the police arrived at the defendant's residence, they were led to an upstairs bedroom where the defendant was sleeping. While in the bedroom, a police officer noticed a pair of white high-topped tennis shoes in plain view on the bedroom floor. When the defendant requested that his wife obtain his shoes for him, he specifically asked for shoes other than the tennis shoes. The defendant was taken into custody and transported to the police station for a lineup. At the lineup, three of the four victims again identified Deitchman as their assailant. Deitchman was then arrested and advised of his *Miranda* rights.

Following Deitchman's arrest, Detective Foster secured separate warrants to search Deitchman's car and home at 3300 West Ohio Avenue. The affidavit prepared by Detective Foster set forth in detail the results of the investigation and identified 3300 West Ohio Avenue as the place to be searched. Among the items sought to be seized were a pair of Nike tennis shoes, a red bandana, and other clothing that was believed to be at the defendant's residence at 3300 West Ohio Avenue. Detective Foster, however, inadvertently failed to allege facts in the affidavit that would link Deitchman to the residence that was to be searched, although the address was included in the affidavit. Detective Foster presented the affidavit to a judge, who determined that it established probable cause and issued both search warrants. Relying on the warrants, the police searched Deitchman's residence and his automobile. The police found the size eight white Nike tennis shoes with a neutral stripe, black laces, and the name "Janet" written on the left shoe in a closet. The police also recovered a red bandana from the defendant's home and seized a second bandana from the defendant's car.

At the suppression hearing, the defendant sought to suppress the evidence seized during the search, claiming that the affida-

vit in support of the warrants failed to establish probable cause as required by the United States and Colorado Constitutions. U.S. Const. amend. IV; Colo. Const. art. II, § 7. The district court found the affidavit to be constitutionally defective, but refused to suppress the evidence in light of the police officer's "good faith" and the "totality of all the evidence." The court concluded that the detective's failure to link the defendant to the location specified in the affidavit constituted a "good faith mistake" under section 16–3–308, and that the exclusionary doctrine should, therefore, not be invoked. A jury subsequently found the defendant guilty of two counts of first-degree sexual assault, two counts of second-degree kidnapping, and one count of attempted second-degree kidnapping.

In our view, the defendant's conviction must be affirmed since reversible error did not occur. Four members of the court are of the opinion that the "good faith" exception created by section 16–3–308, 8 C.R.S. (1984 Supp.), does not apply. Because no concurring opinion dispositive of this case is supported by a majority of the court, separate concurrences follow in order of seniority of the author.

ERICKSON, Chief Justice, concurring:

## I.

The sole issue presented for our consideration is whether the district court erred in refusing to suppress the evidence seized pursuant to the warrants in light of the deficiencies in the affidavit.[1]

In rejecting the defendant's motion to suppress the evidence, the district court relied exclusively on section 16–3–308, 8 C.R.S. (1984 Supp.), Colorado's statutory "good faith" exception to the exclusionary rule. Section 16–3–308 provides in pertinent part:

(1) Evidence which is otherwise admissible in a criminal proceeding shall not be suppressed by the trial court if the court determines that the evidence was seized by a peace officer, as defined in section 18–1–901(3)(1), C.R.S., as a result of a good faith mistake or of a technical violation.

(2) As used in subsection (1) of this section:

(a) "Good faith mistake" means a reasonable judgmental error concerning the existence of facts which if true would be sufficient to constitute probable cause.

(b) "Technical violation" means a reasonable good faith reliance upon a statute which is later ruled unconstitutional, a warrant which is later invalidated due to a good faith mistake, or a court precedent which is later overruled.

On appeal, the defendant claims that section 16–3–308 is not applicable to the type of error committed by the police officer in this case, and that the statute violates article II, section 7 and article III of the Colorado Constitution. I find both arguments to be unpersuasive.

### A.

### *Application of Section 16–3–308*

The General Assembly has broad powers under article III of the Colorado Constitution and may enact laws not expressly or impliedly prohibited by the United States or Colorado Constitutions. *People v. Y.D.M.*, 197 Colo. 403, 593 P.2d 1356 (1979); *Prudential Insurance Co. v. Hummer*, 36 Colo. 208, 84 P. 61 (1906). In determining whether section 16–3–308 conflicts with the United States Constitution, the exclusionary rule must be examined as federal constitutional doctrine.

In *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), the United States Supreme Court held for the first time that the exclusionary rule developed in the federal courts was binding on the states. Prior to *Mapp*, state courts had been free to employ remedies other than the exclusionary rule to enforce fourth amendment guarantees. *Wolf v. Colorado*, 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed.

---

1. We need not consider whether the affidavit that supported the issuance of the warrant violated the defendant's rights under either the United States or Colorado Constitutions. The prosecution conceded at the suppression hearing that the affidavit failed to comply with constitutional prerequisites. Therefore, that issue is not properly before us.

1782 (1949). In *Mapp*, however, a divided Supreme Court overruled *Wolf* and held that prospectively "all evidence obtained by searches and seizures in violation of the Constitution is, by that same authority, inadmissible in a state court." 367 U.S. at 655, 81 S.Ct. at 1691. Writing for a plurality of four,[2] Justice Clark described the exclusionary rule as an "essential part" of the privacy right embodied in the fourth amendment, and noted that the remedy was therefore enforceable against the states through the due process clause of the fourteenth amendment. 367 U.S. at 656, 81 S.Ct. at 1692.[3]

Since *Mapp*, the Supreme Court has restricted the application of the exclusionary rule in several areas of fourth amendment law.[4] In general, the Court has refused to apply the exclusionary rule in cases where the deterrent objective of the rule cannot be achieved. Despite the recent limitations, however, the Supreme Court has not retreated from its holding in *Mapp* that the exclusionary rule is binding on the states.[5] The supremacy clause of the United States Constitution therefore prohibits a state legislature from enacting legislation that is contrary to or inconsistent with the United States Supreme Court's directives on when

2. Justice Black concurred in *Mapp*, but was not persuaded that the fourth amendment, standing alone, was enough to support extending the exclusionary rule to the states. In his concurring opinion, Justice Black described the exclusionary rule as a "judicially created rule of evidence which Congress might negate." 367 U.S. at 661, 81 S.Ct. at 1695 (Black, J., concurring) (quoting *Wolf v. Colorado*, 338 U.S. 25, 39–40, 69 S.Ct. 1359, 1367, 93 L.Ed. 1782 (Black, J., concurring)).

3. Significantly, only four justices in *Mapp* concluded that the exclusionary rule was mandated by the fourth amendment. However, in the cases immediately following *Mapp*, the Supreme Court treated the exclusionary rule as an "essential part" of the fourth amendment's privacy right and routinely excluded evidence in nearly every case involving a fourth amendment violation. *E.g., Ker v. California*, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963). Because the exclusionary rule has been treated as constitutional doctrine state courts have excluded evidence to comply with *Mapp* and its progeny. *See generally* C. Whitebread, *Criminal Procedure: An Analysis of Constitutional Cases and Concepts* § 2.03 at 18 (1980).

4. *See, e.g., United States v. Havens*, 446 U.S. 620, 100 S.Ct. 1912, 64 L.Ed.2d 559 (1980) (illegally seized evidence can be used for impeachment purposes); *Michigan v. DeFillippo*, 443 U.S. 31, 99 S.Ct. 2627, 61 L.Ed.2d 343 (1979) (exclusionary rule does not apply when police officer relies in good faith on a statute that is later declared unconstitutional); *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978) (passenger in an automobile lacks standing to challenge the legality of search); *United States v. Janis*, 428 U.S. 433, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976) (exclusionary rule not available in civil proceedings); *United States v. Peltier*, 422 U.S. 531, 95 S.Ct. 2313, 45 L.Ed.2d 374 (1975) (exclusionary rule not available when police officer relies in good faith on court precedent);

*United States v. Calandra*, 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974) (exclusionary rule not available in grand jury proceedings).

5. Charles Moylan points out, however, that:

Even as the Supreme Court reluctantly adopted the Exclusionary Rule as a desperation measure, because no other feasible sanction appeared on the horizon, it never pretended that it was doing so for the benefit of the defendant. In the best of all worlds, the defendant should have gone to jail for the crime which the physical evidence proved he had committed and the officer who violated the Constitution should have felt the sting of some other sanction. The defendant only received the undeserved and unintended benefit of exclusion because he was the necessary vehicle through whose case the sanction had to be applied to the officer.

*United States v. Calandra*, 414 U.S. 338 [94 S.Ct. 613, 38 L.Ed.2d 561] (1974), asserted flatly that the exclusion of evidence was not "a personal constitutional right of the person aggrieved." *Linkletter v. Walker* [381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965)], spoke to the same effect, "The ruptured privacy of the victims' homes and effects cannot be restored. Reparation comes too late." The majority opinion in *Leon* reaffirmed this unremitting rejection of exclusion as a constitutional entitlement:

"The Fourth Amendment contains no provision expressly precluding the use of evidence obtained in violation of its commands, and an examination of its origin and purposes makes clear that the use of fruits of a past unlawful search or seizure 'works no new Fourth Amendment wrong.'"

C. Moylan, *Back to Normalcy! Some Off-The-Cuff Observations on the Leon & Sheppard Decisions*, Printed in *The Daily Record*, Baltimore, Maryland (July 12, 1984) (quoting *United States v. Leon*, —— U.S. ——, 104 S.Ct. 3405 at 3412, 82 L.Ed.2d 677 at 687 (1984)).

the exclusionary rule must be invoked. U.S. Const. art. VI, § 2. However, a state may enact legislation that is consistent or coextensive with the constitutional limitations imposed on the exclusionary rule by the Supreme Court. Consistent legislative limitations do not violate federal constitutional standards. *See generally Bivens v. Six Unknown Named Agents*, 403 U.S. 388, 422–24, 91 S.Ct. 1999, 2017–19, 29 L.Ed.2d 619 (1971) (Burger, C.J., dissenting) (criticizing the exclusionary rule for suppressing reliable evidence, and calling upon Congress and the states to enact a statutory remedy that would compensate persons whose fourth amendment rights had been violated).

In the present case, the primary issue is whether section 16–3–308 is inconsistent with the United States Supreme Court's decisions that dictate when a state court must invoke the exclusionary rule to deter violations of the fourth amendment. In enacting the good faith statutory exception to the exclusionary rule, the General Assembly stated:

It is hereby declared to be the public policy of the state of Colorado that when evidence is sought to be excluded from the trier of fact in a criminal proceeding because of the conduct of a peace officer leading to its discovery, it will be open to the proponent of the evidence to urge that the conduct in question was taken in a reasonable, good faith belief that it was proper, and in such instances the evidence so discovered should not be kept from the trier of fact if otherwise admissible. . . .

§ 16–3–308(4), 8 C.R.S. (1984 Supp.).

In furtherance of that legislative policy, section 16–3–308(1) expressly provides that a district court shall not suppress evidence that is lawfully seized by a police officer as a result of a "good faith mistake" or a "technical violation." It is significant that in enacting section 16–3–308, the General Assembly saw fit to create two separate and distinct categories of police mistakes: (1) those mistakes that constitute "good faith" mistakes within the meaning of section 16–3–308(2)(a); and (2) those mistakes that are "technical violations" as defined by section 16–3–308(2)(b). The mistake committed by the police officer in the present case falls squarely within subsection (2)(b), which is directed to "a reasonable good faith reliance upon . . . a warrant which is later invalidated due to a good faith mistake." [6]

At the time of the defendant's suppression hearing, there was no judicial authority interpreting the language contained in subsection 2(b). In *People v. Quintero*,

---

**6.** Section 16–3–308(2)(a) is inapplicable to the facts in the present case. Section 16–3–308(2)(a) defines a good faith mistake as a "reasonable judgmental error concerning the existence of facts which if true would be sufficient to constitute probable cause." In *People v. Quintero*, 657 P.2d 948 (Colo.), *cert. granted,* — U.S. ——, 103 S.Ct. 3535, 77 L.Ed.2d 1386, *cert. dismissed,* — U.S. ——, 104 S.Ct. 543, 78 L.Ed.2d 719 (1983), we held that section 16–3–308(2)(a) applies only to factual errors committed by a police officer and not to mistaken judgments of law. 657 P.2d at 951. *Quintero* has no application to the facts presently before us. In *Quintero*, the police received a call reporting a "suspicious looking man" standing at a bus stop carrying a television set. The police officer responded to the call and arrested the man without knowledge that a television set had been stolen. Probable cause was not established until more than five hours after Quintero was arrested. Given these critical facts, we held that the good faith statute did not apply. In *Quintero*, we refused to read section 16–3–308(2)(a) as sup-

planting the constitutional requirement that a police officer must have probable cause prior to making an arrest and conducting an incidental search. Unlike the facts in the present case, the police officer in *Quintero* was not acting pursuant to a judicially issued search warrant. Therefore, the provisions of section 16–3–308(2)(b) did not apply.

In my view, section 16–3–308(2)(a), under which *Quintero* was decided, simply restates the existing standard for probable cause. Probable cause has never required absolute certainty on the police officer's part. Rather, probable cause deals with probabilities and takes into account the reasonable factual misperceptions of the officer. *United States v. Ventresca*, 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965); *People v. Brethauer*, 174 Colo. 29, 482 P.2d 369 (1971); *see also* Note, *The Colorado Statutory Good Faith Exception to the Exclusionary Rule: A Step Too Far?*, 53 U.Colo.L.Rev. 809, 816–17 (1982); W. LaFave *Arrest: The Decision to Take a Suspect Into Custody* (1965).

657 P.2d 948 (Colo.), *cert. granted*, —— U.S. ——, 103 S.Ct. 3535, 77 L.Ed.2d 1386, *cert. dismissed*, —— U.S. ——, 104 S.Ct. 543, 78 L.Ed.2d 719 (1983), however, this court interpreted the "good faith" language in subsection (2)(a) as applying only to a good faith mistake of fact not to a mistaken judgment of law. We noted in *Quintero* that section 16–3–308(2) did not apply to the police officer's mistaken belief that he had probable cause to make an arrest. *See* Y. Kamisar, *Gates, "Probable Cause," "Good Faith," and Beyond*, 69 Iowa L.Rev. 551 (1984). The defendant argues that subsection (2)(b) incorporates a good faith mistake as defined by subsection (2)(a), and that the portion of the definition of "technical violation" which refers to "good faith" reliance on search warrants only encompasses mistakes of fact and not mistakes of law. I disagree.

While it is apparent that the mistake committed by the detective here involves a legal issue, that factor alone does not preclude resort to the provisions of subsection (2)(b). A common sense reading of subsection (2)(b) reveals that the General Assembly intended that the provisions of the subsection include good faith mistakes of law as well as good faith factual errors.[7] To hold otherwise would be to ignore the intent of the General Assembly. In applying the good faith statute in this case, however, I recognize that the resolution of each search and seizure case necessarily depends on the particular facts that are before the court. *United States v. Rabinowitz*, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653 (1950); *Cowdin v. People*, 176 Colo. 466, 491 P.2d 569 (1971).

Following the suppression hearing, the United States Supreme Court decided *United States v. Leon*, —— U.S. ——, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984) and *Massachusetts v. Sheppard*, —— U.S. ——, 104 S.Ct. 3424, 82 L.Ed.2d 737 (1984). In both decisions, the Court held that the exclusionary rule should not be invoked when a police officer relies in good faith on a warrant that is later declared to have been issued in violation of constitutional standards.[8] I be-

---

**7.** Section 16–3–308(2)(b), when read in its entirety, further supports my conclusion that the "good faith" language in subsection (2)(b) encompasses good faith mistakes of law. Subsection (2)(b) evinces an intent, consistent with the United States Supreme Court's rulings, to limit the exclusionary rule to those areas where the deterrent objectives of the rule can actually be achieved. For example, subsection (2)(b) includes within its definition of a good faith "technical violation" instances where a police officer relies on a statute that a court later declares unconstitutional. The wording of the statute parallels *Michigan v. DeFillippo*, 443 U.S. 31, 99 S.Ct. 2627, 61 L.Ed.2d 343 (1979), in which the Supreme Court held that evidence should not be suppressed when it is seized pursuant to an ordinance which is later found to be unconstitutionally vague. The Court noted in *DeFillippo* that unlawful police activity would not be deterred by suppressing the evidence because a "prudent officer [could] not [be] required to anticipate that a court would later hold the ordinance unconstitutional." 443 U.S. at 37–38, 99 S.Ct. at 2632. The mistake committed by the police officer in *DeFillippo*, like the mistake made by the detective here, was a "mistake of law." *See* 1 W. LaFave, *Search & Seizure* § 1.2 at 10–11 (1984 Supp.).

Similarly, subsection (2)(b) also declares that evidence should not be suppressed when a police officer relies on a court decision that is later overruled. The statute again is consistent with the Supreme Court's holding in *United States v. Peltier*, 422 U.S. 531, 95 S.Ct. 2313, 45 L.Ed.2d 374 (1975). In *Peltier*, the Supreme Court recognized that deterrence is not achieved by suppressing evidence under circumstances in which a police officer has relied upon a "validly enacted statute, supported by long-standing administrative regulations and continuous judicial approval." 422 U.S. at 541, 95 S.Ct. at 2319. The mistake made by the police officer in *Peltier* again involved a "mistake of law." 1 W. LaFave, *supra* at 11. *See also* Note: *The Exclusionary Rule and a Good Faith Exception: Is it Time for a Change?*, 35 Mercer L.Rev. 699 (1984).

**8.** Despite their broad language, *Leon* and *Sheppard* do not create a blanket rule of admissibility for all evidence seized pursuant to a defective warrant. Under the good faith exception, a court still retains the power to exclude evidence in those cases where deterrence can be achieved. Specifically, the exclusionary rule is retained in the following situations: (1) where a magistrate or judge plainly had "no business" issuing a warrant; (2) where a magistrate or judge relied on false or misleading information; (3) where the warrant clearly lacks a probable cause basis; and (4) where a judge or magistrate wholly abandons his role as a neutral and detached decision-maker. *See Leon*, —— U.S. at ——–——, 104 S.Ct. at 3421–22, 82 L.Ed.2d at 698–99.

lieve that the Supreme Court's decision in *Sheppard* provides persuasive authority for determining what types of law enforcement errors constitute "technical violations" within the meaning of section 16–3–308(2)(b).[9] *Sheppard* also provides a constitutional benchmark for assessing the validity of Colorado's good faith statute under the federal constitution.

In *Sheppard,* a police officer obtained substantial evidence linking the defendant to a murder, and subsequently prepared an affidavit that set forth facts that were sufficient to establish probable cause to validate a search warrant. Unable to find a suitable warrant form, however, the officer used a standardized "controlled substances" warrant form that he modified as best he could. He presented the affidavit and the warrant to a judge who made some minor alterations and signed the warrant. However, the judge did not alter the substantive portions of the warrant that merely authorized a search for controlled substances. Relying on the apparent legality of the altered warrant, the police searched Sheppard's residence and recovered several items that tied Sheppard to the murder. At trial, the court suppressed the evidence because of the facial defects in the search warrant.

On appeal, the Supreme Court reversed the trial court's suppression order due to the officer's good faith conduct. The Court noted that the police had taken "every step that could reasonably be expected of them" and that their conduct was "objectively reasonable and largely error-free." —— U.S. at ——, 104 S.Ct. at 3429, 82 L.Ed.2d at 744–45. The Court acknowledged that while "an error of constitutional dimensions may have been committed with respect to the issuance of the warrant . . . it was the judge, not the police officers, who made the critical mistake." —— U.S. at ——, 104 S.Ct. at 3429, 82 L.Ed.2d at 745. Because the judge had committed the crucial error, the Court refused to suppress the evidence.[10]

*Sheppard* is analogous to the present case in several respects and is also consistent with the technical violation language contained in section 16–3–308(2)(b). In both *Sheppard* and in this case the police had probable cause to obtain a search warrant as a result of thorough investigations. *Cf. United States v. Leon* (police had not gathered sufficient information to constitute probable cause at the time they sought to secure a search warrant). In addition, the police in both cases prepared detailed affidavits that a neutral and detached judge reviewed and approved. Moreover, the error asserted in both cases involved a "facial" defect that a reasonably prudent police officer could not be expected to detect. Finally, both this case and *Sheppard* involve a mistake that, when considered in the context of the entire record, had no tangible impact on the defendant's constitutional rights.[11]

---

**9.** I would not decide today whether a "technical violation" as defined by section 16–3–308(2)(b) includes the type of law enforcement mistake committed by the police officers in *United States v. Leon.* In *Leon,* unlike the facts in *Sheppard* and the present case, the police had not gathered sufficient information to constitute probable cause at the time they attempted to secure a search warrant.

**10.** The appropriateness of applying the exclusionary rule is also addressed by the *Leon* decision. Justice White, writing for a majority of the Court, stated:

Judges and magistrates are not adjuncts to the law-enforcement team; as neutral judicial officers, they have no stake in the outcome of particular criminal prosecutions. The threat of exclusion thus cannot be expected to significantly deter them.

*United States v. Leon,* —— U.S. at ——, 104 S.Ct. at 3418, 82 L.Ed.2d at 695. Moylan comments that:

Once it is accepted that the only purpose for denying the jury competent evidence is to "police the police," the decisions in *Leon* and *Sheppard* follow ineluctably. Deterrence is only obtained by punishing the police when they are unreasonable and by forbearing to punish them when they are reasonable. The fact patterns, therefore, are analyzed not from the constitutional vantage point of the defendant but from the subjective vantage point of the police. Everything reduces itself to the pivotal question, "Was the police action reasonable?"

Moylan, *supra* note 5.

**11.** In a concurring opinion, Justice Stevens criticized the majority in *Sheppard* for deciding the case on "the broadest possible grounds." ——

I conclude, therefore, that, in light of the similarities to *Sheppard* and the analysis of the Supreme Court, the error in the present case constitutes a "technical violation" within the meaning of section 16–3–308(2)(b). I would also hold that section 16–3–308(2)(b), as applied to the facts in this case, is consistent with fourth amendment precedent and does not violate federal constitutional standards.

### B.

#### *Article II, Section 7*

The defendant asserts that section 16–3–308 vitiates the probable cause requirement of article II, section 7 of the Colorado Constitution. Accordingly, he claims the statute is unconstitutional and that the trial court erred in refusing to suppress the evidence. I do not agree with his analysis.

Like the fourth amendment, article II, section 7 of the Colorado Constitution expressly requires that a warrant be supported by probable cause established by affidavit. Article II, section 7 provides:

The people shall be secure in their persons, papers, homes and effects, from unreasonable searches and seizures; and no warrant to search any place or seize any person or thing shall issue without describing the place to be searched, or the person or thing to be seized, as near as may be, nor without probable cause, supported by oath or affirmation reduced to writing.

Although article II, section 7 contains language virtually identical to its federal counterpart, this court has, in the past, interpreted article II, section 7 as providing an individual with even greater protections than those guaranteed by the fourth amendment to the United States Constitution. *See, e.g., People v. Sporleder*, 666 P.2d 135 (Colo.1983) (individual has reasonable expectation of privacy in telephone pen register under the Colorado Constitu-

tion even though he has no corresponding right under the fourth amendment to the United States Constitution); *Charnes v. DiGiacomo*, 200 Colo. 94, 612 P.2d 1117 (1980) (a taxpayer has a reasonable expectation of privacy in bank records under article II, section 7, even though he has no similar right under the federal constitution); *Hernandez v. People*, 153 Colo. 316, 385 P.2d 996 (1963) (article II, section 7 is more restrictive than fourth amendment and requires that probable cause must be supported by oath or affirmation *reduced to writing*). Thus, even though section 16–3–308 does not violate federal constitutional provisions, the statute's constitutionality must also be assessed under Colorado's own constitutional guarantees.

In enacting a good faith statutory exception to the exclusionary rule, the General Assembly left intact the probable cause requirement and the other constitutional standards for obtaining a valid warrant. The statute does not affect the rights guaranteed under article II, section 7, but merely alters the mechanism available to enforce those rights. Under section 16–3–308(2)(b), the exclusionary sanction simply will not apply in cases in which a police officer has relied in good faith on a defective warrant, a court precedent, or a subsequently invalidated statute.

The defendant argues, however, that the exclusionary rule is an integral part of article II, section 7 and cannot be modified or restricted by the General Assembly. I reject the defendant's argument. The exclusionary rule is not a personal constitutional right, but is a judicially created remedy designed to deter illegal police behavior. *United States v. Calandra*, 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974); *People v. Harfmann*, 638 P.2d 745 (Colo. 1981); *People v. Wolf*, 635 P.2d 213 (Colo. 1981). Neither the fourth amendment nor article II, section 7 affords a citizen a constitutional right to have illegally obtained

U.S. at ——, 104 S.Ct. at 3448, 82 L.Ed.2d at 724 (Stevens, J., concurring). In Justice Stevens' view, the police officer's search was "reasonable" and therefore did not violate fourth amendment strictures. Accordingly, Justice Stevens saw no reason for the court to even reach

the good faith issue. For a similar criticism of the *Sheppard* decision, see Wasserstrom & Mertens, *The Exclusionary Rule on The Scaffold: But Was it a Fair Trial?*, 22 Am.Crim.L.Rev. 85, 100 (1984).

evidence excluded at his trial. At best, the individual defendant stands as an incidental beneficiary of the court's decision to suppress the evidence.

In recognition of the fact that the exclusionary rule is a prophylactic remedy and not a personal constitutional right, this court has never required that all evidence seized in violation of article II, section 7 be suppressed. *See, e.g., Thomeczek v. Bray,* 198 Colo. 341, 600 P.2d 66 (1979) (illegally seized evidence can be used in extradition proceedings); *People v. Wilkerson,* 189 Colo. 448, 541 P.2d 896 (1975) (illegally obtained evidence is admissible in probation proceedings); *LeMasters v. People,* 678 P.2d 538 (Colo.1984) (illegally obtained evidence can be used at trial for impeachment purposes when the defendant elects to take the stand). In general, this court has restricted the exclusionary rule to those areas where its deterrent objectives are most "efficaciously served." *Sporleder,* 666 P.2d at 152 (Rovira, J., dissenting).

By limiting the exclusionary rule to cases where deterrence can be achieved, this court's search and seizure jurisprudence has roughly paralleled the approach taken by the United States Supreme Court. *See generally Illinois v. Gates,* 462 U.S. 213, 254–61, 103 S.Ct. 2317, 2340–44, 76 L.Ed.2d 527, 558–63 (1983) (White, J., concurring). Despite the similarities, however, differences do exist between article II, section 7 and the fourth amendment. In some areas, article II, section 7 affords an individual with protections not guaranteed by its federal counterpart in the Bill of Rights. *See, e.g., Sporleder,* 666 P.2d at 140. *Compare People v. Hill,* 182 Colo. 253, 512 P.2d 257 (1973), *with Kentucky v. Whorton,* 441 U.S. 786, 99 S.Ct. 2088, 60 L.Ed.2d 640 (1979). In those rare cases, Colorado courts can, if necessary, invoke the exclusionary rule to deter police officers from violating Colorado's constitutional guarantees, even though fourth amendment precedent does not require suppression.

In the present case, however, I do not perceive how respect for Colorado's constitutional rights can be achieved by suppressing the evidence. The record reveals that the detective conducted himself in an objectively reasonable manner throughout the entire chain of events that precipitated the search. After conducting a thorough investigation, the detective obtained substantial evidence linking the defendant to the sexual assaults. The detective then prepared an affidavit, as required by article II, section 7. It is undisputed that the detective had the facts necessary to establish probable cause for the search at the time he prepared the affidavit, but that he inadvertently failed to include the facts in the affidavit. The detective presented the affidavit to a judge and obtained official sanction for the search by securing the necessary warrants. Relying on the apparent propriety of the warrants, the officer executed the search in a reasonable manner, searching only those areas specified in the warrants and seizing only those items that he was authorized to seize.

The detective's sole mistake, throughout the entire investigation, was his failure to allege known facts in the affidavit that would link the defendant to the residence to be searched. Such an inadvertent omission, in my opinion, does not demonstrate a willful or flagrant disregard of the defendant's rights under the Colorado Constitution. To the contrary, the detective's actions throughout the investigation were those of a conscientious law enforcement officer concerned with following proper police procedures. The affidavit was prepared and the search warrant was issued after the police officers had obtained an order pursuant to Crim.P. 41.1 and had taken Deitchman into custody at 3300 West Ohio Avenue for the lineup. Thus, the police knew that Deitchman lived at 3300 West Ohio Avenue but inadvertently failed to include that information as the basis for their conclusion that incriminating evidence would be found at that address.

In my view, the critical error in the present case was committed by the judge who reviewed the affidavit, and not by the police officer who prepared it. Police officers, unlike magistrates and judges, are not trained experts in the subtleties and nuances of fourth amendment law. It is the responsibility of the judge, and not the officer, to examine an affidavit to insure

that it complies with constitutional requirements. In the present case, the detective had the information needed to correct the defect in the affidavit had the error been brought to his attention by the judge. To suppress the evidence in this case would serve only to punish the detective for the judge's error, and would not contribute to the deterrence of unconstitutional police activity. As the Supreme Court recently noted in *Leon,* "[p]enalizing the officer for the magistrate's error, rather than his own, cannot logically contribute to the deterrence of [constitutional] violations." —— U.S. at ——, 104 S.Ct. at 3420, 82 L.Ed.2d at 697. *See also United States v. Hendricks,* 743 F.2d 653 (9th Cir.1984).[12]

Moreover, any incremental deterrent benefit that might be achieved by excluding the evidence must be balanced against the substantial costs of suppressing evidence that is highly probative on the issue of guilt. Significantly, the defendant here has not challenged the authenticity of the evidence seized from his home. Nor has he questioned the adequacy or thoroughness of the police officer's investigation and the existence of probable cause to support his arrest for the crimes charged. *Cf. People v. Quintero,* 657 P.2d 948 (Colo.), *cert. granted,* —— U.S. ——, 103 S.Ct. 3535, 77 L.Ed.2d 1386, *cert. dismissed,* —— U.S. ——, 104 S.Ct. 543, 78 L.Ed.2d 719 (1983) (police officer did not have sufficient information to constitute probable cause for arrest, therefore section 16–3–308(2)(a) of good faith statute is inapplicable). The defendant's sole objection concerns a mistake in the affidavit that had no measurable impact on his constitutional rights.[13] I do

**12.** The purpose of the exclusionary rule is to deter illegal police activity by suppressing evidence that is obtained as a result of police misconduct. However, under some circumstances, such as when an officer mistakenly believes that his conduct comports with the Fourth Amendment, the rule fails to deter official misconduct. In response to such cases, the Fifth Circuit announced a "good faith" exception to the exclusionary rule and refused to suppress evidence "discovered by officers in the course of actions that are taken in good faith and in the reasonable, though mistaken, belief that they are authorized." *United States v. Williams,* 622 F.2d 830 (5th Cir.1980) (en banc), *cert. denied,* 449 U.S. 1127, 101 S.Ct. 946, 67 L.Ed.2d 114 (1981). The court of appeals reasoned that the good faith exception is consistent with the purpose of the exclusionary rule which exists to deter willful or flagrant actions by the police, but not their reasonable good faith actions. *See also* Ball, *Good Faith and the Fourth Amendment: The Reasonable Exception to the Exclusionary Rule,* 67 J.Crim.L. & Criminology 635 (1978); Comment, *The Good Faith Exception to the Exclusionary Rule—Adoption by Williams and Richmond,* 51 U.Cin.L.Rev. 83 (1982); Note, *Good Faith and the Exclusionary Rule: Demise of the Exclusion Illusion,* 30 Am.U.L.Rev. 863 (1981); Note, *United States v. Williams: The Good Faith Exception to the Exclusionary Rule,* 32 Mercer L.Rev. 1392 (1981); Note, *Is it Time for a Change in the Exclusionary Rule? United States v. Williams and the Good Faith Exception,* 60 Wash.U.L.Q. 161 (1982); Recent Development, *Limiting the Application of the Exclusionary Rule: The Good Faith Exception,* 34 Vand.L. Rev. 213 (1981). In addition, several states have enacted legislation codifying a good faith exception, *see, e.g.,* Ariz.Rev.Stat. § 13–3925 (1982);

Colo.Rev.Stat. § 16–3–308 (1981); Colorado Survey; Recent Legislation and Colorado Supreme Court Decisions, *The Colorado Statutory Good Faith Exception to the Exclusionary Rule: A Step Too Far?,* 53 U.Colo.L.Rev. 809 (1982); and a similar exception has been proposed on the federal level. *See* S. 2231, 97th Cong., 2d Sess. (1982).

Erickson, *Pronouncements of the United States Supreme Court Relating to the Criminal Law Field: 1982–83,* 99 F.R.D. 345, 370 (1983).

**13.** The Model Code of Pre-Arraignment Procedure suggests using a "substantiality test" for determining when unlawfully seized evidence should be excluded at trial. Under the substantiality test, a court would not invoke the exclusionary sanction in cases, like the present, involving relatively minor police misconduct. American Law Institute, *Model Code of Pre-Arraignment Procedure* § 290.2 (1975). It has been the unlimited application of the exclusionary rule, especially in cases where the police error was inadvertent, that has prompted widespread criticism of the rule in its present form. The substantiality test takes into account both the "willfullness" of the police officer's conduct and the "seriousness" of his mistake in determining whether the exclusionary rule should be invoked. The *Model Code* provides in pertinent part:

(2) *Determination.* A motion to suppress evidence pursuant to this section shall be granted only if the court finds that the violation upon which it is based was substantial, or if otherwise required by the Constitution of the United States or of this State.

If the court finds a violation not to be substantial it shall set forth its reasons for such finding.

not believe that suppression of the evidence here would advance the justifications underlying the exclusionary rule.[14] In fact, the only discernible effect of excluding the evidence in the present case would be to keep relevant and trustworthy evidence from the trier of fact—a result that is particularly unacceptable given the serious nature of the offenses committed.

I would therefore hold that article II, section 7 does not require the suppression of evidence when a police officer acts in good faith reliance on a technically defective warrant. Accordingly, I reject defendant's claim that the good faith statute, as applied to the facts in the present case, violates article II, section 7 of the Colorado Constitution.

### C.

#### Separation of Powers

The defendant also claims that section 16-3-308 violates the principle of separation of powers embodied in article III of the Colorado Constitution. He asserts that the good faith statute is an unconstitutional usurpation by the legislature of the powers belonging exclusively to the judiciary. I disagree.

Whether a particular statute violates the provisions of article III depends on whether the statute is classified as "procedural" or "substantive" in nature. *Page v. Clark*, 197 Colo. 306, 592 P.2d 792 (1979); *People v. McKenna*, 196 Colo. 367, 585 P.2d 275 (1978). As we noted in *Clark*, the judiciary has exclusive jurisdiction over "procedural" matters while the General Assembly has complete control over matters of "substance." 197 Colo. at 318, 592 P.2d at 800. A precise test to differentiate procedural matters from matters of substance has never been fully developed. In *McKenna*, however, we specified the following guidelines to determine whether a "rape shield"

(3) *Violations Deemed Substantial.* A violation shall in all cases be deemed substantial if it was gross, wilful and prejudicial to the accused. A violation shall be deemed wilful regardless of the good faith of the individual officer if it appears to be part of the practice of the law enforcement agency or was authorized by a high authority within it.

(4) *Circumstances to be Considered in Determining Substantiality.* In determining whether a violation not covered by Subsection (3) is substantial, the court shall consider all the circumstances including:

(a) the extent of deviation from lawful conduct;

(b) the extent to which the violation was wilful;

(c) the extent to which privacy was invaded;

(d) the extent to which exclusion will tend to prevent violations of this Code;

(e) whether, but for the violation, the things seized would have been discovered; and

(f) the extent to which the violation prejudiced the moving party's ability to support his motion, or to defend himself in the proceeding in which the things seized are sought to be offered in evidence against him.

*Id.* at § 290.2(2)-(4).

**14.** In addition to the deterrence justification, the Supreme Court has addressed the normative function or goal of judicial integrity as a second reason for suppressing illegally seized evidence. *See, e.g., Terry v. Ohio*, 392 U.S. 1, 13, 88 S.Ct. 1868, 1875, 20 L.Ed.2d 889 (1968); *Elkins v. United States*, 364 U.S. 206, 222, 80 S.Ct. 1437, 1446, 4 L.Ed.2d 1669 (1960); *see also People v. Sporleder*, 666 P.2d 135, 150 (Colo.1983) (Erickson, C.J., dissenting). As Justice Brandeis stated in dissent in *Olmstead v. United States*, 277 U.S. 438, 485, 48 S.Ct. 564, 575, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting), "[i]f the Government becomes a lawbreaker, it breeds contempt for its laws." While occasionally alluded to, judicial integrity has never been seen as an independent justification for excluding evidence. *See* Oaks, *Studying the Exclusionary Rule in Search & Seizure*, 37 U.Chi.L.Rev. 665, 669-70 (1970). In recent years, the deterrence rationale has been described as the primary basis for invoking the exclusionary rule. *Michigan v. Tucker*, 417 U.S. 433, 447, 94 S.Ct. 2357, 2365, 41 L.Ed.2d 182 (1974); *Linkletter v. Walker*, 381 U.S. 618, 637, 85 S.Ct. 1731, 1741, 14 L.Ed.2d 601 (1965); *see also* Note, *The Fourth Amendment Exclusionary Rule: Past, Present, No Future*, 12 Am.Crim.L.Rev. 507, 510 (1975).

To the extent that the normative rationale remains viable, the reason for invoking the exclusionary rule in this case is lacking. The "imperative of judicial integrity" requires admission of the evidence in issue. The court approved the affidavit by issuing the two warrants. The validity of the warrants issued by the court could not be questioned by Detective Foster. The police should not be punished and would not be deterred if the evidence was suppressed because of the court's error in approving the affidavit and issuing the warrants.

statute was a matter of substance or procedure:

> If the purpose ... is to permit a court to function and function efficiently, the rule-making power is inherent unless its impact is such as to conflict with other validly enacted legislative or constitutional policy involving matters other than the orderly dispatch of business.

196 Colo. at 371, 585 P.2d at 277 (quoting Joiner & Miller, *Rules of Practice and Procedure: A Study of Judicial Rule Making,* 55 Mich.L.Rev. 623, 629–30 (1957)).

This court has traditionally recognized that the General Assembly has great latitude in enacting legislation that affects the admissibility of evidence in criminal and civil trials. *See, e.g., McKenna,* 196 Colo. 367, 585 P.2d 275 (1978) (rape shield statute); *People v. Mulligan,* 193 Colo. 509, 568 P.2d 449 (1977) (statute affecting the admissibility of inconsistent statements); *Estate of Thomas v. Davis,* 144 Colo. 358, 356 P.2d 963 (1960) (dead man's statute). As a general rule, we have upheld the General Assembly's right to limit the admissibility of evidence as a matter of substantive public policy.

The defendant claims, however, that the "good faith" statute constitutes a legislative attempt to circumvent the exclusionary rule and to regulate the procedural operation of the courts. In making this argument, the defendant ignores the General Assembly's intent in enacting a good faith statutory exception to the exclusionary rule. The basic purpose of section 16–3–308 is one of *public policy. See* § 16–3–308(4). The statute represents the Colorado General Assembly's response to growing public disapproval of an exclusionary rule that undermines the truth finding process and often causes the guilty to go free. Thus, the statute deals with a matter of substantive public policy, and not with the internal operating proceedings of this court. *Id.* In my opinion, section 16–3–308 does not violate article III of the Colorado Constitution.

Accordingly, I agree that the defendant's conviction should be affirmed.

Justice ROVIRA has authorized me to say that he joins in this concurrence.

DUBOFSKY, Justice, concurring:

I agree with Justice Quinn that the statutory "good faith exception," § 16–3–308, 8 C.R.S. (1978), is inapplicable to the facts of this case, and I join in Part III of his concurring opinion. However, I do not agree with Justice Quinn that police reliance on the affidavit in this case was "entirely unreasonable" within the meaning of *United States v. Leon,* — U.S. ——, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). Rather, I conclude that the evidence here was properly admissible under a limited constitutional "good faith exception" to the exclusionary rule. In so concluding, however, I cannot share in Chief Justice Erickson's wholesale and uncritical adoption of the "good faith exception" announced in *Leon.* In my view, the broad principles announced in *Leon* sweep far beyond any analysis necessary to decide this case, and, when applied to future cases, may ultimately lead to results incompatible with the deterrence rationale of the exclusionary clause. Instead, I would confine our analysis to the narrow facts of this case, and hold that the underlying rationale of the exclusionary rule permits the introduction of the challenged evidence here solely because the objective circumstances of this case demonstrate unequivocally that the police officer possessed probable cause at the time of the search, and that his failure to supply such information in the search warrant application was truly inadvertent.

## I.

In *United States v. Leon,* — U.S. ——, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), the Supreme Court held that evidence seized pursuant to a good faith, reasonable reliance upon a warrant later found invalid may be admitted into evidence during the prosecution's case-in-chief in a criminal trial. The Court reasoned that the purpose of the exclusionary rule is to deter police mis-

conduct, and that costs associated with application of the rule are justified only where the purpose of deterrence is served. 104 S.Ct. at 3419–20. If the police act in objectively reasonable reliance upon a warrant, they have done all that is within their power to ensure a legal search, and there is no misconduct to deter. *Id.* The Court further implied that police reliance upon a warrant is *per se* reasonable, subject to certain exceptions, and that therefore the exclusionary rule will not apply to most illegal searches conducted under color of a warrant. 104 S.Ct. at 3421–22. Among the situations delineated by the Court in which police reliance upon a warrant would not be considered reasonable is one in which the underlying affidavit is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Id.* 104 S.Ct. at 3422 (quoting *Brown v. Illinois,* 422 U.S. 590, 610–11, 95 S.Ct. 2254, 2265, 45 L.Ed.2d 416 (1975) (Powell, J., concurring in part)).[1]

I do not believe, as does Justice Quinn, that the affidavit in this case may be fairly placed within this exception to the rule of *Leon.* Justice Quinn finds that the police officer's reliance on the warrant in this case was "entirely unreasonable" because the warrant was "totally lacking in any indicia of probable cause." Slip op. at 8 (Quinn, J., concurring). However, it is to invalid warrants—those unsupported by probable cause—that the rule of *Leon* is addressed in the first instance. In excepting from this rule those cases in which police reliance upon the warrant is "entire-

ly unreasonable," the Court clearly intended to encompass those situations in which not only is probable cause lacking, but also in which the lack of probable cause is so patent that no reasonable police officer could believe that the warrant is valid.

Whatever else the Supreme Court may have meant by this exception, it is clear to me that the affidavit in this case does not fall below this minimal standard. As discussed in Part III *infra,* the affiant in this case possessed probable cause to search the residence at 3300 West Ohio Avenue, and inadvertently omitted from the affidavit the information linking the defendant to that address. Moreover, the affidavit contained extensive information summarizing the results of the officer's investigation, including facts linking the defendant to a number of sexual assaults in which the items sought by the search warrant played a role. The affiant clearly believed that he had provided the magistrate with all the information he himself had collected. Although the affiant erred in failing to review the affidavit to make certain that he had provided the magistrate with all that he knew, I cannot say that this failing is so egregious as to render reliance on the warrant "entirely unreasonable."[2]

## II.

Although I do not share Justice Quinn's view that the police reliance on the warrant here was "entirely unreasonable" within the meaning of that exception to the rule of *Leon,* neither do I join in Chief Justice

---

**1.** The Court also held that the "good faith exception" to the exclusionary rule will not apply where the affiant supplies false information, where the magistrate wholly abandons his judicial role, or where a warrant is so facially defective (for example, in failing to particularize the place to be searched) that police cannot reasonably presume it to be valid. *United States v. Leon,* —— U.S. ——, 104 S.Ct. 3405, 3421–22, 82 L.Ed.2d 677 (1984). It is not entirely clear whether this list was intended to be exhaustive. In a footnote, the Court raises the possibility of a case-by-case inquiry into "whether a reasonably well-trained officer would have known that the search was illegal despite the magistrate's authorization." *Id.* 104 S.Ct. at 3421 n. 23; *see* S. Wasserstrom and W. Mertens, *The Exclusionary Rule on the Scaffold: But Was It a Fair*

*Trial?,* 22 Am.Crim.L.Rev. 85, 116 (1984) (hereinafter "Wasserstrom and Mertens").

**2.** Neither can I subscribe to Justice Quinn's conclusion that the admission of the tennis shoe with the name "Janet" printed on it was error harmless beyond a reasonable doubt. The description of the tennis shoe, later found in the defendant's bedroom, was central to the prosecution's case. Any doubts that the jury might have entertained as to the credibility of the witnesses' testimony about the shoe were resolved by the admission of the shoe into evidence. In addition, the introduction of the tennis shoe into evidence may have led to the defendant's highly damaging admission that the shoe was his.

Erickson's wholesale adoption of the "good faith exception" outlined in *Leon*. I do not believe that every potential application of the apparently broad "good faith exception" announced in *Leon* will prove compatible with the deterrence rationale of the exclusionary rule. There may arise instances, not yet before us, in which police conduct was not "entirely unreasonable," but in which the admission of the illegally obtained evidence could encourage future police misconduct.

In applying section 16–3–308, Chief Justice Erickson imports into his analysis the "good faith exception" to the exclusionary rule announced in *Massachusetts v. Sheppard*, —— U.S. ——, 104 S.Ct. 3424, 82 L.Ed.2d 737 (1984). In *Sheppard*, the police prepared a search warrant affidavit requesting permission to search for evidence in a homicide investigation and appended to it a standardized warrant form permitting a search for controlled substances and related paraphernalia. A magistrate approved the warrant without deleting the references to controlled substances or altering the warrant to indicate the actual objects of the search. No party contended that the affidavit failed to establish probable cause or particularize the items to be seized; nonetheless, the Supreme Judicial Court of Massachusetts held the warrant invalid and suppressed the evidence seized under its authority because the warrant incorrectly particularized the items to be seized. The United States Supreme Court reversed, holding that, although the warrant was invalid, the police officers acted in reasonable reliance upon the warrant, and the exclusionary rule therefore did not require suppression of the evidence seized. 104 S.Ct. at 3429. In so holding, the Supreme Court relied entirely upon the principles announced in *Leon*.

In the present case, the affidavit failed to state probable cause because no facts were set forth linking the items to be seized with the place to be searched. *People v. Arnold*, 181 Colo. 432, 434, 509 P.2d 1248, 1249 (1973) (affidavit must state probable cause as to each place to be searched). The Chief Justice likens this omission to the facial invalidity of the warrant in *Shep-

*pard*, and concludes that *Sheppard* provides an appropriate standard for determining what constitutes a "technical violation" under section 16–3–308(2)(b).

Such a sweeping analysis is unnecessary to the resolution of this case. The analogy to *Sheppard* is forced and inapt; there, the warrant and affidavit read together supplied probable cause and limited the objects of the search, *see Leon*, 104 S.Ct. at 3448–49 (Stevens, J., concurring and dissenting), while here probable cause appeared nowhere on the face of the warrant application. The forced analogy to *Sheppard* obscures the particular facts before us that should provide the basis for decision, and instead adopts wholesale the "good faith exception" that was announced in *Leon* and that provides the sole rationale for the decision in *Sheppard*.

The "good faith exception" adopted in *Leon* has been criticized on a number of grounds. *See generally Leon*, 104 S.Ct. at 3446–57 (Stevens, J., concurring and dissenting); S. Wasserstrom and W. Mertens, *The Exclusionary Rule on the Scaffold: But Was It a Fair Trial?*, 22 Am.Crim.L. Rev. 85 (1984) (hereinafter "Wasserstrom and Mertens"). As Part III below makes clear, I believe that many of these criticisms expose dangers in the approach of the *Leon* Court. In addition, it is unclear what the parameters of *Leon*'s broad language—much of it unnecessary to its holding—will be when the United States Supreme Court applies it in the future. *See* note 1 *supra*. Therefore, our most prudent course in this case should be to determine whether a "good faith exception" is warranted by the particular facts before us. In so doing, I would reserve the option of proceeding independently under the state constitution should such a course become necessary as the full import of *Leon* emerges in future factual situations. *See* note 2 *infra*. However, under the particular circumstances of this case, I believe that a limited "good faith exception" is warranted, and that such a limited exception responds both to the rationale of *Leon* and to the concerns voiced by the critics of the exception.

### III.

The exclusionary rule is a "judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved." *United States v. Calandra,* 414 U.S. 338, 348, 94 S.Ct. 613, 620, 38 L.Ed.2d 561 (1974). Therefore, the rule is inapplicable where the deterrence purpose is not served, or where the benefits associated with the rule are minimal in comparison to the costs associated with the exclusion of probative evidence. *Leon,* 104 S.Ct. at 3412–16; *People v. Casias,* 193 Colo. 66, 72, 563 P.2d 926, 931 (1977).[3]

Application of the exclusionary rule in the present case would not advance its purpose. The objective circumstances of this case convincingly demonstrate that the police officer possessed probable cause at the time he applied for the warrant, and that his omission from the affidavit of facts sufficient to establish probable cause was inadvertent. Allowing admission of the evidence under these narrow circumstances will not encourage police officers in the future to conduct searches upon less than probable cause, nor to deliberately apply for warrants when probable cause is lacking.[4] On this basis, I would hold that the exclusionary rule does not apply to the illegally seized evidence in the present case.

### A.

Both the fourth amendment to the United States Constitution and article II, section 7 of the Colorado Constitution prohibit "unreasonable" searches and seizures. Although in certain limited contexts a search and seizure may be found reasonable when unaccompanied by probable cause, *see, e.g., Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *Stone v. People,* 174 Colo. 504, 485 P.2d 495 (1971), the entry into an individual residence is never reasonable unless supported by probable cause. The Supreme Court, in *Payton v. New York,* 445 U.S. 573, 585, 100 S.Ct. 1371, 1379, 63 L.Ed.2d 639 (1980) (quoting *United States v. United States District Court,* 407 U.S. 297, 313, 92 S.Ct. 2125, 2134, 32 L.Ed.2d 752 (1972)), declared that "[p]hysical entry of a home is the chief evil against which the wording of the Fourth Amendment is directed." Therefore, in the absence of "a few specifically established and well-delineated exceptions," *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967), a warrant supported by probable cause for arrest or search is always necessary to enter an individual residence. *Payton,* 445 U.S. at 590, 100 S.Ct. at 1382; *Mincey v. Arizona,* 437 U.S. 385, 390, 98 S.Ct. 2408, 2412, 57 L.Ed.2d 290 (1978); *People v. Roark,* 643 P.2d 756, 770 (Colo.1982). Even when exigent circumstances permit a warrantless entry, the police may not enter a private home in the absence of probable cause to search the residence or arrest someone inside. *People v. Bustam,* 641 P.2d 968, 972 (Colo.1982); *People v. Thompson,* 185 Colo. 208, 212, 523 P.2d 128, 131 (1974) (probable cause requirements for warrantless search are "at least as strict" as requirements for warrant).

Therefore, one of the functions of the exclusionary rule under both the United States and Colorado Constitutions must be to deter police officers from conducting residence searches in the absence of proba-

---

**3.** The characterization of the exclusionary rule as a "judicially created remedy" casts doubt upon the federal constitutional status of the rule. Therefore, the extent to which state courts are bound by federal interpretations of the exclusionary rule remains unclear. In addition, this court has not yet considered the question of whether and to what extent the exclusionary rule is required by article II, section 7 of the Colorado Constitution. *See People v. Casias,* 193 Colo. 66, 72 n. 6, 563 P.2d 926, 931 n. 6 (1977). Because I resolve the issue presented here within the parameters of *Leon,* I do not address the status of the exclusionary rule under the state constitution.

**4.** Because the officer's awareness of facts constituting probable cause and the inadvertence of his omission of such facts are proved here by objective circumstances, we need not decide whether to admit illegally seized evidence where the proof of such facts rests substantially or exclusively upon the officer's *post hoc* testimony as to his state of mind. Obviously, the danger of deliberate police evasion of constitutional requirements is much greater in such a case.

ble cause. Critics of *Leon* have charged that it will weaken the deterrence function by encouraging the police to submit warrant applications when the existence of probable cause is uncertain with the hope that a warrant will issue and the evidence obtained will be admissible. *Leon,* 104 S.Ct. at 3454–55 (Stevens, J., concurring and dissenting); Wasserstrom and Mertens at 113–14. Because the existence of probable cause is the bedrock requirement for state intrusion into the homes of private citizens, I agree that we must be careful not to create exceptions to the exclusionary rule that may encourage even occasional evasion of the probable cause requirement. Before any "good faith exception" to the exclusionary rule is applied, I would require that the police officer possess probable cause to conduct the search at issue.

Such a requirement, while creating a narrower "good faith exception" than that apparently fashioned in *Leon,* is consistent with the rationale of that case. The deterrence objective of the exclusionary rule, the Court wrote, is not served "when the offending officers acted in the objectively reasonable belief that their conduct did not violate the Fourth Amendment." *Id.* 104 S.Ct. at 3419. Such an "objectively reasonable belief" cannot be present unless probable cause is also present. We have held that probable cause "depends upon probabilities and not certainties, on knowledge grounded in the practical considerations of everyday life on which reasonable and prudent persons act." *People v. Chase,* 675 P.2d 315, 317 (Colo.1984). Therefore, probable cause is established when, viewing the facts in a "practical, commonsense" manner, there is a "fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983). Under this standard, the police must possess probable cause in order to permit the inference that reliance on a subsequent warrant was reasonable: by definition, a police officer lacking probable cause lacks a reasonable basis for search or arrest; under these circumstances, it cannot

be "objectively reasonable" for the officer to believe that he has fully complied with the dictates of the fourth amendment. *See Leon,* 104 S.Ct. at 3450–51, 3455 (Stevens, J., concurring and dissenting).

In the present case, there is no doubt that Detective Foster possessed probable cause to search the defendant's residence. Two days before obtaining the search warrant, Detective Foster had learned from the defendant's employer that the defendant lived at 3300 West Ohio Avenue. That day, the detective served a Crim.P. 41.1 warrant on the defendant at 3300 West Ohio Avenue. When he and Detective Dinan arrived there, they were admitted by a woman, later identified as the defendant's wife, who told them that the defendant was in the upstairs bedroom. The detectives served the warrant in the bedroom. While there, Detective Dinan noticed that one of the items later enumerated in the search warrant, a pair of the defendant's tennis shoes, was on the floor. Upon either entering or leaving, Detective Foster noticed that a car bearing license plate number CN–4714 was parked in the driveway. This was the license plate number described by one of the victims, and Detective Foster had previously determined that a car bearing that license plate was registered to Jerry I. Deitchman. Based upon this information, Detective Foster possessed probable cause to believe that the defendant resided at 3300 West Ohio Avenue and that the objects of the search would be found there. Admitting the evidence under these circumstances cannot encourage police officers to conduct residence searches or seek warrants without probable cause.

### B.

A finding that the police officer was aware of facts sufficient to constitute probable cause does not end the analysis. As noted above, the warrantless search of a residence is presumptively unreasonable unless it falls within one of a few previously-established exceptions to the warrant requirement.[5] The Supreme Court has re-

---

5. The facts of this case do not fall within any established exception to the warrant require-

ment. Warrantless entry into a residence is

jected any suggestion that the warrant requirement may be easily disregarded:

> We are not dealing with formalities. The presence of a search warrant serves a high function. Absent some grave emergency, the Fourth Amendment has interposed a magistrate between the citizen and the police. This was done not to shield criminals nor to make the home a safe haven for illegal activities. It was done so that an objective mind might weigh the need to invade that privacy in order to enforce the law. The right of privacy was deemed too precious to entrust to the discretion of those whose job is the detection of crime and the arrest of criminals.... And so the Constitution requires a magistrate to pass on the desires of the police before they violate the privacy of the home. We cannot be true to that constitutional requirement and excuse the absence of a search warrant without a showing by those who seek exemption from the constitutional mandate that the exigencies of the situation made that course imperative.

*Chimel v. California,* 395 U.S. 752, 761, 89 S.Ct. 2034, 2039, 23 L.Ed.2d 685 (1969) (quoting *McDonald v. United States,* 335 U.S. 451, 455–56, 69 S.Ct. 191, 193, 93 L.Ed. 153 (1948)). In *Payton,* the Court reaf-

firmed the importance of a neutral determination of probable cause prior to any intrusion into a private home:

> In terms that apply equally to seizures of property and seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant.

445 U.S. at 590, 100 S.Ct. at 1382. *See also People v. McGahey,* 179 Colo. 401, 404, 500 P.2d 977, 978 (1972); *People v. Brethauer,* 174 Colo. 29, 32–33, 482 P.2d 369, 373–74 (1971).[6]

In cases not before the court today, the broad and uncertain rule of *Leon* may have the unintended result of weakening the deterrent effect of the exclusionary rule by encouraging police behavior designed to circumvent the warrant requirement. *See* W. LaFave, *The Fourth Amendment in an Imperfect World: On Drawing "Bright Lines" and "Good Faith",* 43 U.Pitt.L.Rev. 307, 353–54 (1982); Wasserstrom and Mertens at 109.[7] Ultimately, Chief Justice Erickson's view that failure to state probable cause in a search warrant affidavit is a simple formal mistake, obviat-

---

permitted if police officers are in hot pursuit of a suspect whom the officers have probable cause to arrest, *Warden v. Hayden,* 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967), to prevent the destruction of evidence, *People v. Bustam,* 641 P.2d 968, 973 (Colo.1982), or in cases of emergency administrative searches. *Michigan v. Tyler,* 436 U.S. 499, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978). None of these exigencies is present here, nor is any claim made that the particular circumstances of this case mandate creation of a new exception to the warrant requirement.

**6.** The warrant requirements of the Colorado Constitution are more stringent than those of the United States Constitution. Under article II, section 7 of the Colorado Constitution, probable cause must be "supported by oath or affirmation reduced to writing." The magistrate's function is thus more crucial under the Colorado Constitution than it is under the fourth amendment to the United States Constitution. *See People v. Brethauer,* 174 Colo. 29, 39–40, 482 P.2d 369, 372–73 (1971); *Hernandez v. People,* 153 Colo. 316, 321–22, 385 P.2d 996, 999 (1963).

**7.** One recent article suggests that the *Leon* rule may lead to shopping for magistrates known to be "soft" on probable cause:

> With the [exclusionary] rule in place, the police know that if a reviewing court finds the warrant invalid, it will suppress the evidence seized pursuant to the warrant. Under the good faith exception, however, even evidence seized under an invalid warrant will generally be admissible. The police need concern themselves only with getting a warrant and not with getting a warrant that will hold up on review. Consequently, under the good faith exception, we can expect a variation of Gresham's Law to operate; "bad" warrants—those issued by the most indolent, incompetent and indulgent magistrates—will effectively drive out "good" warrants. As a practical matter, the standard of probable cause will be established by the least demanding official authorized to issue warrants, even if this standard falls below the already diluted standard of probable cause established by the Court in *Gates.*

Wasserstrom and Mertens at 109 (footnotes omitted).

ing all necessity for the exclusion of evidence, may reduce the warrant clause to a vestigial formality requiring only shadow compliance. Rather than accept all of the possible ramifications of the Chief Justice's concurring opinion, I prefer to consider adopting exceptions to the exclusionary rule on a case-by-case basis.

Under the facts presented here, there is little danger that police officers will be encouraged to evade the warrant requirement. Detective Foster testified at the suppression hearing that the omission of facts from the affidavit linking the defendant to 3300 West Ohio Avenue was inadvertent. Because Detective Foster possessed such facts at the time of the search warrant application, his testimony is highly credible. Admitting the evidence here will not encourage police officers to cut corners in investigation, deliberately approach magistrates with less than probable cause, or engage in magistrate shopping.

### IV.

In sum, I would hold that it is consistent with the aims of the exclusionary rule under both the federal and state constitutions to admit illegally obtained evidence where, as here, the objective circumstances of the case convincingly demonstrate that the police officer possessed probable cause at the time of the warrant application, and the circumstances further show that any omission of facts from the underlying affidavit was truly inadvertent. I would save for another day the question of whether to adopt the rule of *Leon* in other contexts, or whether we should chart an independent

course under article II, section 7 of the Colorado Constitution.

I am authorized to say that Justice LOHR joins this concurrence.

QUINN, Justice, concurring:

Because the admission of the tennis shoes and the bandana seized from the residence at 3300 West Ohio Avenue was, in my view, harmless error, I concur in the affirmance of the defendant's conviction. I do not believe, however, that the circumstances of this case merit the application of the good faith exception to the Fourth Amendment exclusionary rule as formulated and applied by the United States Supreme Court in *United States v. Leon*, — U.S. ——, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), and *Massachusetts v. Sheppard*, — U.S. ——, 104 S.Ct. 3424, 82 L.Ed.2d 737 (1984). The admittedly defective affidavit underlying the search warrant was so lacking in indicia of probable cause as to foreclose any objectively reasonable reliance upon the validity of the search warrant issued on the basis of the invalid affidavit.

### I.

It should be noted that there were two red bandanas seized during the search pursuant to warrant conducted on November 16, 1981—one seized from the interior of the 1971 Toyota automobile belonging to the defendant and the other seized from the house at 3300 West Ohio Avenue. I am satisfied that the affidavit established probable cause to search the Toyota automobile and that, therefore, the bandana seized from the automobile was properly admitted.[1] With respect to the tennis

---

1. The affidavit alleged that one of the sexual assault victims, identified by name, reported having been kidnapped and assaulted on October 31, 1981, by a man driving "a small white car" with the license number CN 4714. The affidavit further stated that another victim, also identified by name, reported that a man tried to force her into his car on November 4, 1981, and that during this encounter the victim observed a "red bandana hanging on the rear view mirror." The affidavit contained reports from two other women, also identified by name, who reported

having been attacked by a man driving a white or a yellow Toyota with license number CN 4714 or CN 4741. Finally, the affidavit stated that the affiant, Detective Dock Foster, traced the license number CN 4714 to a 1971 Toyota owned by Jerry M. Deitchman of 1755 South Pecos Street. These factual allegations, in my view, provided probable cause for the search of the defendant's 1971 Toyota automobile with license number CN 4714, which resulted in the seizure of the bandana from the interior of the automobile.

shoes and bandana seized from the home, however, it is quite obvious that the affidavit, when measured against applicable constitutional standards, is totally deficient in establishing probable cause to search the residence at 3300 West Ohio Avenue.

The Fourth Amendment to the United States Constitution requires that a search warrant be based on probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the person or things to be seized. U.S. Const. amend. IV. Article II, section 7 of the Colorado Constitution is even more specific in the requirement of probable cause by expressly mandating that the probable cause necessary for the warrant, in addition to being supported by oath or affirmation, must be "reduced to writing." *See Hernandez v. People*, 153 Colo. 316, 385 P.2d 996 (1963). The constitutional standard of probable cause involves a level of knowledge grounded in the practical considerations of everyday life on which reasonable and prudent persons act. *E.g., Brinegar v. United States*, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949); *People v. Ball*, 639 P.2d 1078 (Colo.1982). In a search pursuant to warrant, this standard requires that the affidavit allege sufficient facts to warrant a person of reasonable caution in the belief that contraband or evidence of criminal activity is located on the premises to be searched. *See, e.g., United States v. Ventresca*, 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965); *People v. Hearty*, 644 P.2d 302 (Colo.1982).

A judicial officer issuing a search warrant has the responsibility to determine whether, given all the circumstances set forth in the affidavit, "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983). This determination must be made on the basis of the information contained within the four corners of the affidavit. *Whiteley v. Warden*, 401 U.S. 560, 565 n. 8, 91 S.Ct. 1031, 1035 n. 8, 28 L.Ed.2d 306 (1971); *People v. Padilla*, 182 Colo. 101, 105, 511 P.2d 480, 482 (1973); *People v. Goggin*, 177

Colo. 19, 21, 492 P.2d 618, 619 (1972). Were the rule otherwise, the warrant requirement of the Fourth Amendment would be rendered meaningless. Because the nonconsensual physical entry into the home by a governmental official is the chief evil against which the Fourth Amendment is directed, *Payton v. New York*, 445 U.S. 573, 583–85, 100 S.Ct. 1371, 1378–79, 63 L.Ed.2d 639 (1980); *McCall v. People*, 623 P.2d 397, 401 (Colo.1981), the constitutional requirement that the affidavit establish a factual basis for probable cause is particularly critical in the case of a warrant authorizing the search of a home.

The preface of the affidavit in this case stated that the affiant, Denver Police Detective Dock Foster, had "reason to believe" that there were located at the premises of 3300 West Ohio Avenue in Denver, Colorado, a white pair of Nike tennis shoes with the name "Janet" written on the left shoe, a red bandana, and several other items of specifically designated property. The factual basis for this belief, as alleged in the affidavit, was: (1) a report by one of the victims, identified by name, that on October 31, 1981, she had been sexually assaulted by a Spanish American male, 20 years of age, 5'9" tall, wearing blue jeans, a green T-shirt, and white Nike tennis shoes with the name "Janet" written on the left shoe, and driving a car with a license number CN 4714; and (2) a report from another victim, also identified by name, who stated that on November 4, 1981, a Caucasian 20 year old man, 5'8" tall and weighing approximately 130 pounds, wearing blue jeans and a red T-shirt, attempted to force her into a light yellow Datsun "with a red bandana hanging on the rear view mirror." The affidavit of Detective Foster stated that his investigation "revealed that CN–4714 lists to *Jerry M. Deitchman, of 1755 South Pecos Street* on a 1971 Toyota" and that "Deitchman is a Caucasian (dark complexioned) male, 5'8" tall, 140 pounds." (emphasis added).

Thus, not only did the affidavit fail to establish to a fair probability that Jerry M. Deitchman lived at 3300 West Ohio Avenue

and that the tennis shoes and the red bandana would be found at that location, but, in addition, it affirmatively stated that Deitchman's address was at an entirely different location, namely, 1755 South Pecos Street. The search warrant for 3300 West Ohio Avenue, therefore, was manifestly invalid as unsupported by any showing of cause at all for its issuance.

## II.

Because the seizure of the tennis shoes and the bandana from 3300 West Ohio Avenue was constitutionally infirm, it is necessary to determine whether the "good faith exception" to the Fourth Amendment exclusionary rule applies to the circumstances of this case. I conclude that the good faith exception has no application here.

## A.

In *United States v. Leon*, —— U.S. ——, 104 S.Ct. 3405, 82 L.Ed.2d 677, the affidavit for a search warrant was based primarily on a tip from an anonymous informant. The Ninth Circuit Court of Appeals, in affirming the trial court's partial grant of the defendant's motion to suppress, held that the information provided by the informant was inadequate to establish probable cause under the two-pronged test developed in *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), and *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). The Supreme Court, declining to consider whether the affidavit satisfied the "totality of circumstances" test announced in *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527, which rejected the *Aguilar-Spinelli* standard, chose instead to modify the exclusionary rule by adopting a good faith exception to the exclusionary rule for evidence wrongfully seized in a search pursuant to warrant. To qualify for the good faith exception, the police must obtain the evidence "in objectively reasonable reliance on a subsequently invalidated search warrant." 104 S.Ct. at 3421.

The Supreme Court's formulation of the exception was based on its perception that the exclusionary rule cannot be expected "to deter objectively reasonable law enforcement activity." 104 S.Ct. at 3419. The reasoning here seems to be that as long as an affidavit alleges a colorable though technically insufficient case of probable cause to search and as long as a judge impartially reviews the affidavit and incorrectly concludes that probable cause exists, then, in view of the fact that reasonable minds frequently differ on the issue of probable cause, suppression of any evidence illegally seized under the warrant would merely penalize the police for the judge's error and would not logically contribute to the deterrence rationale of the exclusionary rule. The Court, however, cautioned that suppression remains an appropriate remedy in those circumstances where the police have no objectively reasonable basis for relying on the validity of the search warrant. One of the circumstances expressly exempted from the good faith exception is, as stated in *Leon*, the seizure of evidence pursuant to a search warrant "based on an affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.'" *Leon*, 104 S.Ct. at 3422 [quoting *Brown v. Illinois*, 422 U.S. 590, 610–11, 95 S.Ct. 2254, 2265, 45 L.Ed.2d 416 (1975) (Powell, J., concurring in part)].

The good faith exception in *Leon* is bottomed in an objective standard of reasonableness. Irrespective of the many uncertainties that this exception might pose for Fourth Amendment doctrine, *Leon* does make crystal clear that subjective good faith is simply not enough to withstand a constitutional challenge to a search and seizure conducted under an invalid search warrant:

> We emphasize that the standard of reasonableness we adopt is an objective one. Many objections to a good-faith exception assume that the exception will turn on the subjective good faith of individual officers. "Grounding the modification in objective reasonableness, however, retains the value of the exclusionary rule as an incentive for the law en-

forcement profession as a whole to conduct themselves in accord with the Fourth Amendment." [citations omitted]. The objective standard we adopt, moreover, requires officers to have a reasonable knowledge of what the law prohibits.

*Leon,* 104 S.Ct. at 3420 n. 20.

No principle is more basic to Fourth Amendment jurisprudence than the prohibition against a search based on a warrant totally lacking in probable cause. A police officer requesting a search warrant must be presumed to know that it is his constitutional responsibility to include in the affidavit sufficient facts to support a finding of probable cause for the issuance of a warrant for the search of another's home. *Leon*'s objective standard of reasonableness would be totally illusory if police officers are not to be held to at least this minimal standard of knowledge. Where, therefore, as here, a search warrant is constitutionally infirm due to the failure of the affidavit to establish probable cause, the applicability of the good faith exception should turn on whether there was an objectively reasonable basis for a police officer to rely on the validity of the warrant. Objective reasonableness in this context must be determined on the basis of the "indicia of probable cause" contained in the affidavit. *Leon,* 104 S.Ct. at 3422.

In this case the affidavit of Detective Foster was totally lacking in any indicia of probable cause to search 3300 West Ohio Avenue. Even if "indicia of probable cause" is equated with the diminished standard of plausible possibility, the affidavit fails the test. There is simply no recitation of facts which will support an inference, even to a plausible possibility, that Deitchman lived at 3300 West Ohio Avenue or that the evidence sought by the police would be found there. That Detective Foster might have possessed independent knowledge of facts establishing Deitchman's present address as 3300 West Ohio Avenue rather than 1755 South Pecos Street is, in my view, no aid to the establishment of the good faith exception. Such facts never made their way into the affidavit. Uncommunicated knowledge of facts never brought to the attention of the judge issuing the warrant neither mitigates the facial deficiency of the affidavit nor provides any discernible indicia that might arguably support an objectively reasonable reliance on the validity of the warrant. Utilization of the good faith exception to uphold the search and seizure in this case is to convert what I perceive to be nothing more than subjective good faith into an objective standard of reasonable reliance with respect to a search warrant that, so far as concerns the constitutional requirement of probable cause, was no more factually supported than a warrant issued without any affidavit at all. The Supreme Court, as I read *Leon,* never intended the good faith exception to encompass such a fundamental infirmity in the warrant process.[2]

### B.

I find *Massachusetts v. Sheppard,* —— U.S. ——, 104 S.Ct. 3424, 82 L.Ed.2d 737,

---

2. Some aids of right judgment on the scope of the good faith exception may be gleaned from examples that arguably would provide an objectively reasonable basis for police reliance on a subsequently invalidated search warrant. These examples might include search warrants issued on the basis of any of the following affidavits: (1) an affidavit stating that the defendant lived at "3030 West Ohio Avenue" and containing facts showing the presence of contraband or incriminating evidence at this address, when the actual address for which the warrant issues is 3300 West Ohio Avenue, the correct address of the home to be searched—in other words, a typographical error made by the officer in preparing the affidavit; (2) an affidavit listing the residence to be searched as 3300 West Ohio Avenue, but containing only the barest averment that the evidence sought had some connection with that residence, such as a statement that the suspect had been seen on occasions entering and leaving the premises; or (3) an affidavit containing stale information, such as statements showing that the suspect had lived at the house several months prior to the preparation of the affidavit but offering no account of his present whereabouts. These examples, I believe, would probably qualify for the good faith exception adopted by *Leon* because in each instance the affidavit alleges what is at least a colorable though technically insufficient case of probable cause.

inapplicable to this case. In *Sheppard*, the police obtained a search warrant for a house owned by Osborne Sheppard, who was a boyfriend of the victim whose burned and beaten body had been found in a vacant lot. An affidavit in support of an arrest and search warrant was prepared by a police detective on a Sunday afternoon. The affidavit specifically listed various items that were sought by the police, including clothing of the victim and a blunt instrument that might have been used to kill her. The detective showed the affidavit to the district attorney, the assistant district attorney, and a police sergeant, all of whom concluded that it set forth probable cause for the arrest of Sheppard and the search of his home. Unfortunately, the only warrant form that the detective could find on that day was a narcotics warrant form. The detective-affiant took the affidavit and the warrant form to the residence of a judge, who examined the affidavit and stated that he would authorize the search. The detective then offered the warrant form to the judge and told the judge that he knew it dealt only with controlled substances. After unsuccessfully looking for a more suitable warrant form, the judge informed the detective that he would make the necessary changes in the warrant form so as to provide a proper search warrant. The judge took the form, made some changes on it, dated and signed the warrant, but failed to change the substantive portion dealing with controlled substances and also failed to expressly incorporate the affidavit into the warrant. The judge then returned the affidavit to the detective, telling him that the warrant was sufficient authority to carry out the search. Police officers thereafter went to Sheppard's residence, limited the search to the items listed in the affidavit, and seized several incriminating items of evidence.

Sheppard was convicted of first degree murder, but the Supreme Court of Massachusetts reversed his conviction, holding that the incriminating evidence, although seized on the basis of a reasonable good faith belief in the validity of the warrant, should have been excluded. The Supreme Court of the United States concluded that the facts clearly established "an objectively reasonable basis for the officers' mistaken belief" in the validity of the warrant, 104 S.Ct. at 3428–29, and, in reversing the judgment, stated:

> In sum, the police conduct in this case clearly was objectively reasonable and largely error-free. An error of constitutional dimensions may have been committed with respect to the issuance of the warrant, but it was the judge, not the police officers, who made the critical mistake. "[T]he exclusionary rule was adopted to deter unlawful searches by police, not to punish the errors of magistrates and judges." [citation omitted]. Suppressing evidence because the judge failed to make all the necessary clerical corrections despite his assurances that such changes would be made will not serve the deterrent function that the exclusionary rule was designed to achieve. Accordingly, federal law does not require the exclusion of the disputed evidence in this case.

104 S.Ct. at 3429–30.

Unlike the error in *Sheppard*, the error in this case was not in the technical form of the warrant but in the affiant-officer's failure to include in the affidavit the barest factual statement connecting 3300 West Ohio Avenue with the evidence sought by the police. This case, therefore, is plainly what the court in *Sheppard* expressly recognized was not within its holding: "an instance in which 'it is plainly evident that a magistrate or judge had no business issuing a warrant.'" *Sheppard*, 104 S.Ct. at 3429 n. 7, quoting *Illinois v. Gates*, 103 S.Ct. at 2345 (White, J., concurring). Reliance on *Sheppard* as authority for categorizing the illegal seizure in this case as a "technical violation" within the good faith exception is, by *Sheppard's* own terms, necessarily misplaced.

### III.

Because I view the admission of the tennis shoes and the red bandana seized from 3300 West Ohio Avenue as a violation of the Fourth Amendment to the United States Constitution, I believe it unnecessary to engage in an analysis of the admis-

sibility of this evidence under the statutory good faith exception of section 16–3–308, 8 C.R.S. (1984 Supp.). Since some members of the court have addressed this issue, however, I will briefly comment on it. In so doing, I refrain from expressing any view on whether the statutory "good faith exception" comports with article II, section 7 of the Colorado Constitution. The reason why this question need not be answered at this time is that the statutory exception, by its own terms, is not applicable to the circumstances present here.

Section 16–3–308, 8 C.R.S. (1984 Supp.), states in pertinent part as follows:

(1) Evidence which is otherwise admissible in a criminal proceeding shall not be suppressed by the trial court if the court determines that the evidence was seized by a peace officer ... as a result of a good faith mistake or of a technical violation.

(2) As used in subsection (1) of this section:

(a) "Good faith mistake" means a reasonable judgmental error concerning the existence of facts which if true would be sufficient to constitute probable cause.

(b) "Technical violation" means a reasonable good faith reliance upon a statute which is later ruled unconstitutional, a warrant which is later invalidated due to a good faith mistake, or a court precedent which is later overruled.

A "good faith mistake" as defined in subsection (2)(a) is restricted to "mistakes based on reasonable judgmental errors of *fact* rather than mistakes of *law*." *People v. Mitchell,* 678 P.2d 990, 995 (Colo.1984) (emphasis in original); *see People v. Quintero,* 657 P.2d 948, 950–51 (Colo.1983), *cert. granted sub nom. Colorado v. Quintero,* —— U.S. ——, 103 S.Ct. 3535, 77 L.Ed.2d 1386, *cert. dismissed,* —— U.S. ——, 104 S.Ct. 543, 78 L.Ed.2d 719 (1983).[3] The only portion of the definition of "technical violation" relevant here is that which

is directed to "a reasonable good faith reliance upon ... a warrant which is later invalidated due to a good faith mistake." This definition, however, expressly incorporates "good faith mistake" as defined in subsection (2)(a). Thus, the express language of section 16–3–308(2) compels the conclusion that the portion of the definition of "technical violation" which refers to reliance on a warrant later invalidated encompasses only good faith mistakes of fact and not mistakes of law.

No "technical violation" occurred in this case. Officer Foster had knowledge that the defendant lived at 3300 West Ohio Avenue. In executing the warrant, therefore, he was not laboring under some reasonable judgmental error concerning the location of the defendant's home. On the contrary, the officer's inadvertence in failing to include in the affidavit any facts linking the evidence sought to 3300 West Ohio Avenue was a basic error of law, not a judgmental mistake about some fact which, if true, would constitute probable cause. Under these circumstances, the lack of any indicia of probable cause in the affidavit to support the search warrant for 3300 West Ohio Avenue renders any reliance upon the warrant "far beyond the purview of a 'technical violation'" as that term is used in section 16–3–308(2)(b). *People v. Mitchell,* 678 P.2d at 996. I would therefore hold that the seizure of the Nike tennis shoes and the red bandana from 3300 West Ohio Avenue did not qualify under Colorado's statutory good faith exception to the exclusionary rule.

## IV.

Although I believe the Nike tennis shoes and the red bandana taken from the residence were the products of an unconstitutional search and were improperly admitted into evidence, I would nonetheless affirm the judgment. Before a constitutional error can be deemed harmless, a court must

---

**3.** By contrast, the good faith exception promulgated by the United States Supreme Court makes no such distinction between errors of law and errors of fact. *Massachusetts v. Shep-*

*pard,* —— U.S. ——, 104 S.Ct. 3424, 82 L.Ed.2d 737 (1984); *United States v. Leon,* —— U.S. ——, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984).

be satisfied beyond a reasonable doubt that the error did not affect the jury's ultimate resolution of the case. *Harrington v. California,* 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969); *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *LeMasters v. People,* 678 P.2d 538 (Colo.1984); *People v. Mack,* 638 P.2d 257 (Colo.1981). A review of the trial proceedings convinces me that the source, quality, and quantity of the prosecution's evidence, when considered independently of the tennis shoes and red bandana seized from the residence, were such that there was no reasonable possibility that the admission of the challenged evidence affected the jury's verdicts.

During the prosecution's case in chief, Detective Phillip Dinan testified that prior to the search of 3300 West Ohio Avenue on November 16, 1981, in which the tennis shoes and red bandana were seized, he took the defendant into custody pursuant to a court order for nontestimonial identification evidence. While the detective was waiting in the defendant's home while the defendant dressed, he heard the defendant ask his wife to get him a pair of shoes. The defendant's wife attempted to pick up a pair of tennis shoes on the floor in the bedroom of the home, but when the defendant told her "not that pair" she obtained a pair of boots from another part of the bedroom. Detective Dinan, according to his trial testimony, was able to observe the tennis shoes and described them as "[h]i-topped, white tennis shoes, like old style basketball shoes." The detective also testified that, after taking the defendant into custody on this occasion, he saw parked outside the home a pale yellow "Toyota type vehicle" with the license number CN

4714 and a red bandana lying on the front seat.

The victim of the sexual assault that occurred on October 31, 1981, made an in-trial identification of the defendant as her assailant before any mention of the tennis shoes was made or before they were introduced into evidence.[4] This victim, during the prosecution's case in chief, described what her assailant was wearing at the time of the assault, and her description included "high-top Nike tennis shoes with neutral stripes, black shoe laces," "size eight" with the word "Janet on the inside of the left or the left shoe on the ankle." She also testified to her prior identifications of the defendant in a photographic array and in a lineup shortly after the assault. It was only after she had described the shoes worn by her assailant and had made an in-trial identification of the defendant that the tennis shoes were admitted into evidence.

The victim of the attempted kidnapping that occurred on November 4, 1981, testified during the prosecution's case in chief that in the course of the offense she saw a red bandana hanging from the rear view mirror of her assailant's car.[5] She identified the defendant in court and testified to having previously identified him in a photographic array and lineup. At this point in the trial the prosecution showed her the red bandana seized from the automobile and the red bandana seized from 3300 West Ohio Avenue, and she characterized them as being similar in appearance to the bandana which she had seen in the automobile. The red bandana seized from 3300 West Ohio Avenue played no part in the in-trial

4. This victim testified that on October 31, 1981, the defendant grabbed her as she walked by his car, forced her into his car, held her with a broken glass bottle to the throat, drove her some distance, and then compelled her to commit fellatio. As a result of this incident, the defendant was charged in two counts with first degree sexual assault, § 18–3–402, 8 C.R.S. (1978 and 1984 Supp.), and second degree kidnapping, § 18–3–302, 8 C.R.S. (1984 Supp.). The jury returned guilty verdicts on both counts.

5. This victim testified that on November 4, 1981, as she walked by the defendant's parked car, he grabbed her and attempted to force her into the car, but that she managed to escape. As a result of this incident, the defendant was charged with attempted second degree kidnapping, §§ 18–2–101, 8 C.R.S. (1978), and 18–3–302, 8 C.R.S. (1984 Supp.), and the jury returned a guilty verdict on this charge.

identification of the defendant by this victim.

Thus, both the prosecution's eyewitness identification evidence and the circumstantial evidence connecting the defendant with the crimes charged originated in sources independent of the illegal seizure of the Nike tennis shoes and the red bandana from 3300 West Ohio Avenue. The actual admission of these two items of evidence was, under these circumstances, cumulative at best. More important, the prosecution's other evidence of guilt was so overwhelming that, in my view, there was no reasonable possibility that the improperly admitted evidence contributed to the defendant's conviction. I would therefore affirm the judgment.

I am authorized to say that Justice KIRSHBAUM concurs in the harmless error analysis in Part IV of this opinion.

NEIGHBORS, Justice, concurring:

I concur in the result reached by the court. Because I believe the case can be resolved on the basis of harmless error, I join in section IV of Justice Quinn's concurring opinion.

In light of the People's concession that the affidavit of Detective Foster was constitutionally defective, the only search and seizure question addressed by the trial court was the applicability of the Colorado good-faith statute, section 16–3–308, 8 C.R.S. (1984 Supp.), to the case. At no time did the trial court consider the wide array of theories and issues upon which the members of the court write today. If it is necessary to address the question of whether the tennis shoes and one bandana were properly seized in compliance with constitutional requirements, then consideration of that issue should be limited to the context of the good-faith statute. The number and diversity of separate opinions provide ample evidence as to why we should heed our statements in *People v. Enea*, 665 P.2d 1026, 1028 (Colo.1983), where we noted:

When we follow our traditional practice of adjudicating difficult and novel constitutional questions only in concrete factual situations, the adjudications tend to be crafted with greater wisdom. Hypothetical rulings are inherently treacherous and prone to lead us into unforeseen errors; they are qualitatively less reliable than the products of case-by-case adjudications.

(Quoting *New York v. Ferber*, 458 U.S. 747, 780–81, 102 S.Ct. 3348, 3367–68, 73 L.Ed.2d 1113 (1982) (Stevens, J., concurring).) The various opinions in this case add only confusion and heat, rather than clarity and light, to the field of search and seizure law. Law enforcement officials, the bench, and the bar will receive precious little guidance from the court's resolution of this appeal. However, in view of the breadth of the concurring opinions, I write separately to express my concern with the court's readiness to resort to gyrating federal search and seizure doctrines to define the constitutional rights at issue, rather than to independently interpret the protection against unreasonable searches and seizures embodied in article II, section 7 of the Colorado Constitution.

The highest court in the state has the ultimate duty to define the rights and privileges guaranteed to its citizens by the state constitution. Although the federal and state constitutions may be similarly or even identically phrased, state courts are free to consider the merits of a constitutional challenge under their own constitutional provisions, and are free to do so independently of United States Supreme Court opinions. *Oregon v. Hass*, 420 U.S. 714, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975). *See Lujan v. Colorado State Board of Education*, 649 P.2d 1005, 1016 (Colo.1982); *People ex rel. Juhan v. District Court*, 165 Colo. 253, 439 P.2d 741 (1968).

Under the basic doctrines of federalism, a state constitution provides an independent and adequate ground for resolution of constitutional issues. *See Colorado v. Nunez*, —— U.S. ——, 104 S.Ct. 1257, 79

L.Ed.2d 338 (1984) (certiorari dismissed as improvidently granted because the judgment of the Colorado Supreme Court rested on independent and adequate state grounds). However, a state court which declines to specify what rights its constitution confers upon the citizens of its state but instead strains to rest its judgment on federal constitutional grounds abrogates its duty, disparages whatever protections the state constitution does confer, and makes an ill-advised entry into the federal domain. *Massachusetts v. Upton*, — U.S. ——, 104 S.Ct. 2085, 2090–91, 80 L.Ed.2d 721 (1984) (Stevens, J., concurring).

Moreover, "[t]o submerge the analysis of a state constitution in doctrines derived from the work of the United States Supreme Court serves neither the law nor theory itself." Linde, *E Pluribus—Constitutional Theory and State Courts*, 18 Ga. L.Rev. 165, 194 (1984).

> The crucial step for ... state courts ... is to recognize that the Supreme Court's answer is not presumptively the right answer, to be followed unless the state court explains why not.
>
> The right question is not whether a state's guarantee is the same as or broader than its federal counterpart as interpreted by the Supreme Court. The right question is what the state's guarantee means and how it applies to the case at hand.

*Id.* at 179; *see also Upton*, — U.S. ——, 104 S.Ct. 2085, 2091, 80 L.Ed.2d 721 (Stevens, J., concurring).[1]

As a result of *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), which extended to state courts the rule that evidence illegally obtained was inadmissible in a criminal prosecution, and "to implement the constitutional guarantees against unlawful searches and seizures," this court adopted Crim.P. 41 providing for suppression of evidence illegally obtained. *Hernandez v. People*, 153 Colo. 316, 319, 385 P.2d 996, 998 (1963). In *Hernandez*, we stated: "In our view, *Mapp*, supra, does not by its terms nationalize the law of search and seizure, ... but it does compel state courts to examine and resolve the problems arising from the search for and the seizure of evidence in the light of *state and federal* constitutional guarantees against unlawful searches and seizures." *Id.* at 319, 385 P.2d at 998 (emphasis added).

---

1. Members of the Supreme Court have drawn the state courts' attention to their independent responsibility to determine their states' constitutional law. Justice O'Connor recently stated:

> There is a fine line, of course, between a state court holding that an action *independently* violates both the State and Federal Constitutions, and holding that the State Constitution is violated *because* the Federal Constitution is violated. Recently, there has been a tendency for the Supreme Court to find no independent state ground and to assert its power to review if it appears that both federal and state constitutional provisions are cited by the state court, that the state cases generally follow the federal interpretation, and the state court does not clearly and expressly articulate its separate reliance on independent state grounds. See *South Dakota v. Neville*, 459 U.S. 553 [103 S.Ct. 916, 74 L.Ed.2d 748] (1983); *Delaware v. Prouse*, 440 U.S. 648 [99 S.Ct. 1391, 59 L.Ed.2d 660] (1979).
>
> The point of this discussion is to emphasize that, as state court judges, you have a very real power to decide cases, whether they are civil or criminal, on state grounds alone, if they exist, or to indicate clearly and expressly that the decision is alternatively based on separate and independent state grounds....

*State v. Kennedy*, 295 Or. 260, 666 P.2d 1316, 1323 n. 10 (1983) (quoting speech by Hon. Sandra D. O'Connor, Associate Justice, U.S. Supreme Court, at The National Judicial College, Reno, Nevada (May 13, 1983) (emphasis in original)).

Chief Justice Burger has also stated: "State courts ... are responsible for first resolving issues arising under their constitutions and statutes and then for passing on matters concerning federal law." *Kennedy*, 295 Or. 260, 666 P.2d 1316, 1323 n. 10 (quoting Year-End Report on the Judiciary, 23 (1981)).

*See also McCray v. New York*, 461 U.S. 961, 103 S.Ct. 2438, 77 L.Ed.2d 1322 (1983) (Justices Stevens, Blackmun, and Powell withheld votes sufficient to have granted a petition for writ of certiorari concerning defense objections to prosecution use of peremptory challenges which had the effect of excluding jurors by reason of their race. The three Justices noted that some state courts had addressed the issue and that the state experience would assist the Supreme Court in formulating its own views.).

Accordingly, this court has held that article II, section 7 of the Colorado Constitution provides greater protection to Colorado citizens than does the fourth amendment. *Compare People v. Corr,* 682 P.2d 20 (Colo.), *cert. denied,* —— U.S. ——, 105 S.Ct. 181, 83 L.Ed.2d 115 (1984), *and People v. Sporleder,* 666 P.2d 135 (Colo.1983), *with Smith v. Maryland,* 442 U.S. 735, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979), *and Charnes v. DiGiacomo,* 200 Colo. 94, 612 P.2d 1117 (1980), *with United States v. Miller,* 425 U.S. 435, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976), *and People v. Nunez,* 658 P.2d 879 (Colo.), *cert. granted,* —— U.S. ——, 104 S.Ct. 65, 78 L.Ed.2d 80 (1983), *cert. dismissed,* —— U.S. ——, 104 S.Ct. 1257, 79 L.Ed.2d 338 (1984), *with Colorado v. Nunez,* —— U.S. ——, 104 S.Ct. 1257, 79 L.Ed.2d 338 (1984) (White, J., concurring).[2] Nevertheless, the concurring opinions generally ignore this independent analysis and, instead, are guided by the broad holdings of recent Supreme Court decisions.

Article II, section 7 requires that no search warrant shall issue except on a showing of probable cause which has been "reduced to writing." This textual variation from the fourth amendment indicates "beyond a doubt that sufficient facts to support a magistrate's determination of probable cause must appear on the face of the written affidavit." *People v. Baird,* 172 Colo. 112, 116, 470 P.2d 20, 22 (1970).[3]

The People concede that the affidavit of Detective Foster is constitutionally deficient. Simply stated, the affidavit clearly fails to allege sufficient facts for a person of reasonable caution to believe that the items to be seized were located in the premises to be searched. *People v. Conwell,* 649 P.2d 1099 (Colo.1982). The defect in the affidavit was "cured" by oral statements given at the suppression hearing. Article II, section 7 of the Colorado Constitution and our case law forbid the use of such information to bolster a defective affidavit. *People v. Dailey,* 639 P.2d 1068 (Colo.1982); *People v. Jackson,* 189 Colo. 316, 543 P.2d 705 (1975); *People v. Padilla,* 182 Colo. 101, 511 P.2d 480 (1973); *People v. Brethauer,* 174 Colo. 29, 482 P.2d 369 (1971).

Having determined that there was a constitutional violation, the applicability of the good-faith statute must be examined on the assumption that the statute is constitutional.[4] I agree with Justice Dubofsky and Justice Quinn that the statute does not apply to the facts of this case. Regardless of what the legislature might have intended, the plain language of the statute, including the use of the phrase "reasonable judgmental error concerning the existence of facts" renders the good-faith exception to the exclusionary rule more narrow than the exception established by the Supreme

---

**2.** Implicit in these decisions is the recognition that evidence seized in violation of the constitutional requirements imposed by article II, section 7 must be suppressed. I would save for another day any discussion of the purpose of the exclusionary rule, *e.g.,* to deter police misconduct, to deter judges from issuing invalid warrants, or to prevent the government from profiting from the violation of the defendant's constitutional rights by the government. *See* White, *Forgotten Points in the "Exclusionary Rule" Debate,* 81 Mich.L.Rev. 1273 (1983). Resolution of this issue will require the court to decide whether the exclusionary rule is a judicially created remedy subject to being modified by legislation or the courts, or whether the exclusionary rule is part and parcel of the constitutional proscription against unreasonable searches and seizures under article II, section 7 of the Colorado Constitution.

**3.** The fourth amendment contains no requirement that the affidavit be reduced to writing.

However, in *Whiteley v. Warden,* 401 U.S. 560, 565 n. 8, 91 S.Ct. 1031, 1035 n. 8, 28 L.Ed.2d 306 (1971), the Court stated:

Under the cases of this Court, an otherwise insufficient affidavit cannot be rehabilitated by testimony concerning information possessed by the affiant when he sought the warrant but not disclosed to the issuing magistrate. *See Aguilar v. Texas,* 378 U.S. 108, 109 n. 1 [84 S.Ct. 1509, 1511 n. 1, 12 L.Ed.2d 723 (1964)]. A contrary rule would, of course, render the warrant requirements of the Fourth Amendment meaningless.

**4.** Because section 16–3–308, 8 C.R.S. (1984 Supp.), is not applicable to this case, I decline to express any view on whether the provision violates article II, section 7 of the Colorado Constitution.

Court in *Massachusetts v. Sheppard,* —— U.S. ——, 104 S.Ct. 3424, 82 L.Ed.2d 737 (1984), and *United States v. Leon,* —— U.S. ——, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984).

Moreover, recognizing a good-faith exception to the exclusionary rule on the ground that Detective Foster knew of the defendant's connection with the place to be searched, but merely neglected to include it in the written affidavit, is contrary to the direct mandate of article II, section 7 of the Colorado Constitution that probable cause be established by an oath or affirmation reduced to writing. By ignoring the uniqueness and independence of our own constitutional provisions, I fear this court may become merely a passenger on a vessel captained by the federal judiciary.

For the reasons I have stated, I believe the tennis shoes and red bandana seized from the defendant's residence should have been suppressed by the trial court. However, because I view the admission of those items into evidence as harmless error beyond a reasonable doubt, I would affirm the judgment of the trial court.